IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21 –CV-_____-___

CHRISTOPHER SCHILLACI,

Plaintiff,

v.

KEHE DISTRIBUTORS, LLC,

Defendant.

PLAINTIFF'S COMPLAINT WITH DEMAND FOR JURY TRIAL

Plaintiff, Christopher "Tony" Schillaci, by and through his attorney, Ralph Lamar, for this his Complaint, respectfully alleges as follows:

**I.      NATURE OF THE CASE**

1.     This employment discrimination and civil rights action is brought against Defendant KeHE Distributors, LLC (hereinafter "KeHE"), by Plaintiff Christopher "Tony" Schillaci for equitable relief and monetary damages to redress the deprivation of civil rights secured to him by the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the Americans with Disabilities Act Amendment Act (ADAAA), 42 U.S.C. § 2000e *et seq*., while he was an employee of Defendant.

Specifically, he alleges that KeHE allowed him to be subjected to a hostile working environment based upon his national origin (Italian). Schillaci complained of the harassing treatment by his co-workers and members of management. Nothing was done and the harassment continued. Such constitutes a violation of Title VII. Additionally, Schillaci requested a reasonable

1

accommodation in August of 2020 in the form of not being required to go inside the freezer because it aggravated his medical condition. While the accommodation was provided his employment was terminated just two weeks later in retaliation because he engaged in protected activity by requesting a reasonable accommodation.

Schillaci alleges that the Defendant's actions caused him mental distress and humiliation, and loss of employment and compensation. He seeks back pay, reinstatement or front pay, compensatory damages, punitive damages, and attorneys' fees and costs of this action.

## II.    JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the Title VII and ADAAA claims under 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and said claims are brought to recover damages for the deprivation of Schillaci's civil rights.

3.      Venue is proper in this judicial District under 28 U.S.C. § 1391(b), (c) and 42 U.S.C. § 2000e-5(f)(3), because defendant KeHE has offices, conducts business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred therein.

## III.   PARTIES

4.      Plaintiff is a citizen of the U.S. currently residing in Denver, CO and is subject to the jurisdiction of this court.

5.      Defendant was the employer who terminated plaintiff's employment. At all relevant times during plaintiff's employment by Defendant it employed 15 or more employees, and therefore is subject to the provisions of Title VII and the ADAAA and is subject to the jurisdiction of this Court under those statutes.

6.      Defendant's office is located at 2200 N. Himalaya Road, in Aurora, CO. Defendant is therefore subject to the personal jurisdiction of this court.

### IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     All conditions precedent to the institution of this suit have been fulfilled.  Plaintiff timely filed a charge of discrimination with the EEOC on November 9, 2020.  On September 15, 2021, a Notice of Right to Sue was issued by the EEOC in connection with charge #32A-2021-00110.  This action is filed within ninety (90) days of plaintiff's receipt of said notice.

### V.     STATEMENT OF FACTS

8.     Schillaci became ill with Type II Diabetes in the late summer early fall of 2014.

9.     Schillaci's diabetes means his body does not maintain blood sugar levels effectively.

10.     As a result of his diabetes plaintiff is an individual with a disability.

11.     Plaintiff started working for KeHE on October 11, 2018 as a Reach Lift Operator doing Let Downs in the warehouse.

12.     He was never issued a Forklift Assignment and was told by Dave Pell and Chris Zenivich (the trainers) that they didn't assign forklifts at KeHE.

13.     At the time of his hire Schillaci was suffering from an undiagnosed health condition known as Celiacs Disease.

14.     It was causing some issues with his Type II Diabetes and was making him very ill.

15.     About two weeks after Schillaci was hired he had to put water in his reachlifts battery.

16.     He was in the middle of doing that and didn't have his safety gear on.

17.     Because he was a new employee he didn't know where the safety gear was kept.

18. Mike Ruland, the General Manager, walked up with Jesse Grahman, the Warehouse Manager, and said "Hey Tony Boloney if I catch you doing that again I'm gonna kick your fucking ass."

19. It was the first time anyone said anything of a negative nature toward Schillaci's national origin.

20. Although Schillaci struggled his first four months at KeHE due to his illnesses he tried to keep a positive attitude and worked with his bosses.

21. Schillaci's performance evaluations reflected his positive attitude.

22. His performance steadily improved and by March the company never had a reason to complain to Schillaci about his work again.

23. In April Schillaci received the first promised raise and started accruing PTO.

24. In April of 2019 Schillaci had a low blood sugar event at work.

25. He had taken his diabetic medication in the morning and by the time he got to work his blood sugar was dropping. It dropped to about 58.

26. Schillaci went into the breakroom because he felt he was going to pass out.

27  He called 911 and an ambulance came.

28. Schillaci spent the next two days in the hospital.

29. After Schillaci fully recovered and went back to work Ruland, continued to call Schillaci by ethnic nicknames, including "Tony Bologna."

30. Ruland walked by Schillaci once while he was doing a let-down.

31. Ruland yelled down the aisle, "Hey Tony Bologna! Mets Suck".

32. Some of Schillaci's coworkers were present and they started laughing at Ruland's comment.

33. It made Schillaci feel uncomfortable.

34. In early August of 2019 Schillaci became very ill.

35. Over the next two weeks, after multiple doctors' office visits and various tests, his primary care physician admitted him into UCH Hospital.

36. They ran more tests and ultimately diagnosed him with Celiacs Disease.

37. Schillaci recovered and returned to work after the Labor Day holiday.

38. When his one-year anniversary came around in October of 2019 Schillaci filed a claim for intermittent FMLA.  His request for FMLA leave was approved for a few days a month for medical reasons relating to Type II Diabetes, Celiacs Disease, Uric Acid kidney Stones and Gout.

39. Almost immediately thereafter his work environment changed into a very toxic harassing and stressful place. Schillaci's Floor Supervisor, Gary Underwood, stopped to talk to him in the aisles one day in mid-October while he was in the process of filing the FMLA claim. Underwood asked Schillaci how he was feeling.

40. He said he had noticed Schillaci had been out a while back.

41. Schillaci said that he had Celiacs disease, and explained what that was.

42. Underwood's reaction was to make a joke out of it based on Schillaci's ethnicity.

43. He said "What? Tony Schillaci can't eat pasta?" had a good laugh about it, and from that point on Schillaci was "Tony Macaroni" to Underwood.

44. He would call Schillaci "Tony Macaroni" in front of other workers.

45. Underwood and Ruland regularly degraded Schillaci's ethnicity on the warehouse floor in front of his coworkers.

46. It was so pervasive that Schillaci's co-workers picked up on it and started calling Schillaci "Tony Bologna" and "Tony Macaroni" in the aisles. The name calling showed a complete lack of respect for Schillaci.

47. There was an event of disrespect that occurred later that fall.

48. It involved an individual named Shane.

49. Shane was the trainer.

50. Shane had two new hires on two reachlifts. These two new hires were practicing stacking empty pallets.

51. Schillaci went to the back dock for the receiving office and told Underwood there weren't any lifts left and the new hires were tying up two lifts.

52. Underwood said "well they are going have to share a lift. Go tell Shane to give you the lift that has the best charge. I need you doing let downs."

53. Schillaci relayed this to Shane.

54. Shane stood there looking off in the distance as if he were thinking. Then he said "I don't care what he say."

55. Schillaci said "Shane, Gary said you have to give one up. I have work to do."

56. Underwood was Shane's supervisor and the order therefore should have been followed.

57. Schillaci then searched the warehouse for another lift, but none were available.

58. Schillaci then went back to Underwood and told him that Shane was refusing to give up a lift and that he had searched the warehouse and there were no others available.

59. Underwood looked lost and had no verbal response.

60. Schillaci then immediately went to the front office to speak to Ruland or Grahman.

61. Neither were in the building.

62. Demetrius LNU (last name unknown) and Devin Keyes were scheduled for the night shift and neither of them were at work yet.

63. Because Underwood refused to enforce his own command Schillaci had to go elsewhere to try to enforce it and get a forklift so he could perform his job.

64. Schillaci saw Jennifer Hubbard, the Safety Director of the Warehouse, and appealed to her.

65. She came out of her office and after Schillaci explained the situation she said there was nothing she could do – that it was a "production issue".

66. Shane felt he could treat Schillaci with such disrespect because he knew how Underwood and Ruland felt about Schillaci through their mocking of his name and ethnicity.

67. Shane's act of direct insubordination was not punished.

68. The next incident occurred in January of 2020.

69. When Schillaci went into the break room at the end of the day to get his pack and go home the break room was a filthy mess.

70. Garbage covered the tables.

71. Fast-food, candy wrappers, empty chip bags, and half drank coffee cups and bottles littered every table.

72. It was an entire day's worth of trash.

73. Schillaci needed to get his gloves and watch cap out of his pack so he set the pack down, moving the trash out of the way.

74. There was so much trash that a coffee cup half full of cold coffee on the other side of the table fell onto the floor.

75. Schillaci had a bus to catch and so he left the mess right on the floor.

76. It was a filthy cup of half consumed coffee that had dirty hand prints on the white Styrofoam. Schillaci treated it like it was a biohazard – not to be touched.

77. The next morning when Schillaci came to work the break room had been cleaned.

78. On one of the tables was a sign. It read "TONY BOLOGNA CLEAN UP YOUR COFFEE MESS".

79. Some of his coworkers saw him and started laughing at him.

80. Schillaci picked the sign up in disgust and went up to the front office and asked the receptionist if Grahman (the # 2 person under Ruland and a member of management) was in.

81. She said yes and buzzed him in.

82. Schillaci went into Grahman's office and showed him the sign.

83. Schillaci said he had found it in the breakroom.

84. Grahman's response was to ask Schillaci what he wanted done about it.

85. Schillaci told him to do what he thought was appropriate.

86. Schillaci also told Grahman that he had been called "Tony Bologna" and "Tony Macaroni" and that Ruland had started the name calling.

87. Schillaci told Grahman that he considered it an insult to his Italian ethnicity.

88. The sign he found in the break room was proof that all the "Tony Bologna" stuff was an ethnic insult.

89. Schillaci explained the mess to Grahman, that it wasn't his own coffee that had spilled, and was some disgusting half-consumed cup that someone had left.

90. Grahman agreed it was not Schillaci's fault.

8

91. Grahman never told Schillaci that he had done anything in response to the complaint Schillaci had made that day about the regular name calling that made fun of his Italian heritage.

92. Sadly, the name calling continued unabated.

93. Over the course of his employment with respondent from the time it started until his termination Schillaci was called these names over 20 times.

94. The last few months at KeHE were miserable for Schillaci.

95. Every day he had trouble finding equipment to use.

96. By the time he got to work all the lifts would be gone.

97. He would start his day walking the entire warehouse looking for a lift.

98. Most of the time he could not find equipment to use.

99. He would then have to go to Grahman or Underwood to get a forklift to use.

100. From February 2019 until Schillaci's employment was terminated he never received any disciplinary actions about his work or attitude.

101. It was quite the opposite when he spoke with his supervisors.

102. They always seemed pleased with his work.

103. When he did make occasional mistakes plaintiff would correct them.

104. In August, the Friday night Manager Devon Keyes transferred to the Portland, OR location.  Paula Villalva was promoted to fill that position where she oversaw the floor on Fridays.

105. Almost immediately Villalva assigned Schillaci to work the freezer.

106. On August 21, on his first shift in the freezer, Schillaci had a great deal of difficulty with the extreme cold which negatively affected his blood sugar levels.

107. On August 28 Schillaci started feeling sick again after working in the freezer.

108. He checked his blood sugar level and it was almost 600.

109. He reported to Villalva and told her he had to leave due to his blood sugar level being dangerously high.

110. Villalva asked if anything was wrong. Schillaci told her he would speak with Melissa LNU (last name unknown), the Human Resources Representative, and then he left.

111. After leaving work Schillaci scheduled an appointment with his physician.

112. At the appointment the doctor told Schillaci he was having an adverse diabetic reaction to the extreme cold and that he shouldn't be working in the freezer.

113. Later on the 28th, Schillaci provided that information along with a doctor's note to Melissa, and asked that he not be assigned to work in the freezer.

114. Melissa said she would inform leadership that Schillaci was not to be assigned to work in the freezer.

115. On September 11 Schillaci was at work.

116. After about a half hour an employee named Ray came up the aisle and said "Hey man, get off that lift, its mine."

117. Schillaci had never seen another KeHE let down operator try this tactic.

118. There were no forklift assignments at KeHE.

119. Demetrius had previously told the operators to just get on whatever lift was available when they started their shift.

120. Ray went to Villalva to complain about Schillaci's use of the forklift.

121. As Villalva walked down the aisle toward Schillaci she asked how to pronounce his name.

122. Schillaci told her and she mispronounced it anyway.

123. She said she needed him to get off of "Ray's lift" because Ray had let downs to do.

124. Schillaci said "not a chance. This isn't Ray's lift."

125. He then said that in claiming there were assigned forklifts they didn't know what they were talking about and specifically stated "we don't do forklift assignments on first shift."

126. Schillaci then told Villalva about what Demetrius had told him about how forklifts were used.

127. Schillaci then asked Villalva what lift he was supposed to use.

128. Her response was that she didn't know and that he would have to go find one.

129. This was unlike anything Schillaci had ever seen at KeHE.

130. No manager he had ever dealt with had treated him with such disrespect.

131. He had also never seen anyone else kicked off of a forklift in that manner.

132. Schillaci told her that he wasn't going to let her bully him off equipment he was using.

133. He said "I'm going to teach you, you're going to learn. I'm going to show you Paula."

134. He got back on the lift and she said "show me what?"

135. He responded "I'm going to have my say about this to Jesse and Melissa."

136. It was not a physical threat to her and she knew it was not.

137. Villalva knew what Schillaci meant.

138. Villalva's comment to Schillaci that KeHE had a policy about assignments of forklifts was not accurate and she knew there was no such policy.

139. Employees were allowed to get on an unused lift that was available and get to work.

140. She knew Schillaci was going to use KeHE's open door policy and tell management about the incident and how she had made no attempt to manage.

141. Villalva knew that she had two day-shift let down operators on the floor that morning and that she had made no attempt to manage crew or equipment and keep both workers busy.

142. Villalva had been a Supervisor at KeHE for years and knew what she was doing was wrong.

143. It was a retaliatory order to Schillaci to get off the forklift after Melissa told Villalva not to place Schillaci in the freezer any more due to his medical condition.

144. Plaintiff was suspended later that day.

145. Plaintiff's employment with Defendant was terminated on September 16, 2020.

## COUNT I

### TITLE VII VIOLATION – HOSTILE WORK ENVIRONMENT

146. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 145 as though set forth fully herein.

147. The harassing conduct by Ruland, Underwood and Schillaci's co-workers was unwelcome.

148. The harassment plaintiff was subjected to by Ruland, Underwood and Schillaci's co-workers was pervasive and/or severe, and was based upon plaintiff's national origin (he is Italian).

149. The harassment was such that a reasonable person would have perceived the harassment to interfere with his work and constitute a hostile work environment.

150. Because Defendant was aware of the harassment and failed to take steps reasonably designed to stop or prevent the harassment from occurring in the future it is liable for a violation of Title VII.

151. As a direct result of Defendant's intentional and unlawful actions in violation of Title VII, plaintiff has suffered economic damages, emotional pain and distress, and has sustained a loss of benefits, and interest due thereon.

152. Defendant's actions were taken with malice and/or reckless indifference to plaintiff's federally protected civil rights under Title VII, and plaintiff is therefore entitled to receive punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor:

(a) Awarding compensatory damages;

(b) Awarding punitive damages;

(c) Awarding the costs of this action, together with reasonable attorney's fees; and

(d) granting such other relief as the Court deems necessary and appropriate.

## COUNT II

**AMERICANS WITH DISABILITIES ACT VIOLATION - RETALIATION**

153. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

154. Through his request for a reasonable accommodation plaintiff engaged in protected activity.

155. Plaintiff's employment was terminated because of his protected activity in violation of the anti-retaliation provisions of the ADAAA.

156. Plaintiff has been injured by the actions of Defendant which injuries include lost pay and benefits and emotional distress.

157. Defendant's actions were taken with malice and/or reckless indifference to plaintiff's federally protected civil rights under the ADAAA, and plaintiff is therefore entitled to receive punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor:

(a) Awarding lost wages, including lost fringe benefits;

(b) Awarding compensatory damages;

(c) Awarding punitive damages;

(d) Order his reinstatement, or in the alternative, award front pay;

(e) Awarding the costs of this action, together with reasonable attorney's fees; and

(f) granting such other relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated this 2nd day of December, 2021.

                        Respectfully submitted,

By:   *s/Ralph E. Lamar*
       Ralph E. Lamar
       CO Attorney I.D. No. 44123
       902 W. Hamilton St., #225
       Allentown, PA 18101
       ralphlamar@ymail.com

       Attorney for Plaintiff